21-1214 et al., Vistra Corp. Petitioners v. Federal Energy Regulatory Commission, Mr. Hughes for the Petitioners, Mr. Flint for the Intervenors for Petitioners, PJM Interconnection LLC, Mr. Emcee for the Respondents, Mr. Mayes for the Intervenors in support of the Respondents. Good morning. Good morning, Your Honor. May it please the Court, Paul Hughes on behalf of the Petitioners. The PJM capacity market is critical to ensuring that, in times of emergency, sufficient power is available. The February 2021 winter storm in Texas illustrates the power emergencies may be catastrophic, and the 2014 Polar Vortex event gave rise to the market structure at issue here. This case addresses how capacity suppliers may bid into the PJM capacity market, and we submit that FERC erred in three distinct respects. First, FERC earlier correctly said that capacity suppliers could account for the lost opportunity of bonus payments. FERC's reversal is unwarranted and unreasonable. Second, in providing for unit-specific offers, FERC disallowed significant risks that capacity suppliers undertake because of the capacity commitments. This is arbitrary and capricious. Third, FERC is wrong to claim that the capacity sellers lack Section 205 rights. As a textual matter, Section 205 clearly encompasses capacity offers, and the report squarely held in Atlantic City, the participants in the PJM market cannot qualify as a concession of Section 205 rights. I'd like to take those in order, but of course, I'd be happy to begin any way the court may like. Do you dispute that the March 2021 determination that the default offer cap was too high? No, Your Honor, I don't think we dispute the earliest determination that there was a miscalibration of the anticipated emergency hours. And so I think there was an understanding at the outset when the structure was put in place that this court recognized advanced energy, that there would need to be likely recalibration of the system, and I don't think anyone disputes that. I will say many of FERC's arguments go to disputes about how the 2016 capacity performance structure operates and challenges to that. And to many of those, I'm sure we'll go through several of them, we don't disagree that FERC has objections to the 2016 capacity performance. That's not the basis of our claim. The basis of our claim is the new tariff that was implemented in 2021. We think for these very discrete, but very important reasons, fails FERC's obligations under the Administrative Procedure Act. So we don't object to the notion that there was a 206 finding, a complaint, a finding of unjust and reasonableness. What we're concerned with is the replacement tariff that was implemented in court defects that are in that replacement tariff. So turning to that first court defect is FERC's abandonment of opportunity costs arising from foregone bonuses was this clear error. So this performance capacity structure, which still exists in relevant part, creates penalties and bonuses. That's if you have a capacity commitment and you don't perform, there's a penalty. If you have a capacity commitment and you overperform, you have a bonus. Or if you don't have a capacity commitment, you have a bonus. What FERC said in 2016 is that this system of penalties and bonuses creates opportunity costs, and a competitive market offer accounts for that risk and that opportunity cost. That was that court decision. And this court in Advanced Energy specifically looked at that and recognized that. So you say you do not want to attack the 2015 tariff, but only what was done in 2021. But in so arguing, this court does not have to accept, does it, the proposition that FERC's explanation for what it has done now in 2021 draws on the experience it had as to what there are a number of assumptions, a number of the party's statements prove not to be demonstrated as was anticipated. And you start out here by saying you don't deny that some adjustment or recalibration was needed. And so FERC came up with a recalibration. You don't like it, and you say why FERC should have done something else. But that's not really the issue, is it? The question is whether or not it adequately explained what it did and why. And the fact that you don't agree with the conclusion or even its interpretation of its experience is basically not relevant, is it? Well, respectfully, I disagree with the conclusion you draw, Your Honor. I think I agree with much of what you said is that FERC changing from 2016 and finding adjustments and unreasonableness of 2016, and then it had flexibility in some respects to craft a new system. I think that is true so far as it goes. But in adopting that new era, it had to still comply with the APA. And there are very specific, concrete ways in which it didn't do so. But what I'm getting at is the argument to the contrary is that it did so, but you disagree with its explanation. And I don't see the APA or the FBA requiring that you necessarily agree. And so that's why I think some of the statements in your brief are a little misleading. I mean, it's fine if you don't agree, if you give us reasons. But that's different from saying FERC never responded, never addressed the alternatives. But when clearly, when you read its order and order on rehearing, it did. Isn't your burden to tell us why those explanations are insufficient? Yes, Your Honor, absolutely. And so let me try to do that with a little bit more precision because I think there are two in particular to focus on. The first is FERC earlier said that a competitive offer can account for opportunity costs. They've now denied the ability to account for opportunity costs, but they've never explained why opportunity cost isn't part of a legitimate offer. Well, come back and say something a little to the contrary, don't they? That's what I'm getting at is you want a different system. And FERC says, well, in the system we want, here's why we did certain things. So I just want to be clear as to why the opportunity costs that it allowed under the 2015 system allow these offers to simply be too high. And so this is, I think, the key thing to disentangle, Your Honor, is they've made the opportunity cost is too high. That is a different issue from what we're addressing. What we're addressing is if there is opportunity cost and FERC doesn't deny there's opportunity cost, can you account for the existence of that opportunity cost? That's sort of a question one is do you have the right to even claim the opportunity cost? Question two is how do you calculate the opportunity cost? So when FERC says, that's what I just need to understand in your argument, are you disputing that the record shows that you are, three years out, able to accurately, within reason, identify these costs? Or is it really just speculation? I mean, so much could happen in three years. Your Honor, I think you can legitimately identify them and FERC itself recognizes that. Paragraph 71 of its order in September of 2021, that's the appendix 1092, it recognizes that sellers will have the ability to estimate this and that there will be a variation of ranges. So that's point one. FERC recognizes these are things that can be subject to estimation. The second point is FERC has retained the very penalty and bonus structure at the heart here, which includes these estimates. So FERC has not walked away from the notion of having that there is risk and opportunity costs in the system that exist inherent to those penalties and bonuses. If FERC wants to say that we're going to scrap the entire system of capacity performance, perhaps, Your Honor, then you say there wouldn't be opportunity costs in the system, but they've not done that and they've kept those estimates. I don't think it's appropriate to say that you have estimates for one part of the tariff, but then you don't allow estimates when it comes to actually providing capacity suppliers compensation or the ability to recover that in a market-based off. When do you know what it is? And FERC says, you know, we are unpersuaded by what was presented to us that these costs can be, other than speculative, three years out. Well, FERC expressly in paragraph 71 does not say these are not calculable. FERC says that these are... Later. Well, I think if it does, if Your Honor, it would contradict itself in 71 because it says the party suppliers can provide estimates and that there can be determinations that are made in this regard. And the existence of there being an ability to estimate is inherent in the fact that there still is the bonuses and the penalty structure, because that's also based on an estimate. And so given that the bonus and penalty structure was inherently based on the estimate still exists, I don't think they can say that we can't, you know, calculate it for this point. And the third part is just the capacity markets themselves inherently reflect predictions. Now, they're educated predictions about what future markets, generally three years in advance, are going to look like. And that's why when FERC engages in this sort of rate making, it recognizes that what it has to change and that there has to be some iteration or the outset recalibration. So that's why we don't think it's a surprise that the values that were earlier picked need to be recalibrated. We're not disputing FERC's view that, again, to Judge Child's question, opening argument, we don't dispute that the recalibration was needed and that there has to be a dynamic conversation about setting these rates. The point is, if FERC maintains the structure that it's maintaining, such that there are penalties and bonuses, there are real costs that are imposed on capacity suppliers. And in 2016, FERC said a competitive offer includes compensation for those legitimate costs. FERC has never said that is wrong. They've now said it's harder to calculate for, and again, I think FERC's best argument is at page 62 to 63 of their brief, where they point to the paragraph 24 of the recurring petition for the point where they say the opportunity cost was set too high. But when you look at the rationale, the reason for that, FERC explains it at paragraph 25 of the re-hearing decision, that's the joint appendix 1243, straddling over to 44. What FERC says is, quote, the formula used to calculate opportunity costs established in the capacity performance order is no longer just and reasonable because it incorporated an excessive expected emergency hours. This is a justification to fix how it calculates opportunity costs. It's not a justification to say that even though there's opportunity costs in the system, half the capacity suppliers can't factor that opportunity cost into their offers when FERC previously said they could. They just haven't given a reasonable explanation for that very poor, narrow issue, and it would be irrational, I think, if they were to say, yes, these costs exist, but capacity suppliers can't account for them in making a competitive offer. We're essentially talking about rates, though, right? Yes. But has that ever been used consistently in the case law? Sorry, Your Honor. The term rate, is it even used consistently? Well, and Your Honor, you're addressing the Section 205 argument about the meaning. So I think that the core is that the output, well, FERC certainly agrees that the outcome of the capacity auction is a rate, and we think that a bid into that which could set that outcome is certainly a rate demanded. I don't think FERC has a particularly powerful textual argument to say that a bid that they recognize could set the clearing rate to be the marginal price is anything other than a bid demanded, or a rate demanded. And I think FERC's key argument, actually in the Section 205 argument, is what they suggest is the capacity supplier isn't actually demanding the specific bid, that they're demanding the clearing rate. But that argument can't be right, because if a capacity supplier's bid is more than what the clearing price ultimately is, then they just won't sell into that auction. They'll have demanded a rate more than where the auction closed, and they simply won't sell. They'll have demanded a rate, they won't have gotten it, so they won't have sold. So I don't think it works for FERC to be able to say that we're somehow just demanding the clearing price when that may turn out to be incorrect. FERC's other argument that I don't think is really a textual one, it's just sort of a pragmatic argument, is that these are inputs into the rates. But I think FERC itself has been inconsistent with that point. If you look at this court's Exelon decision, I think it's important is the remand decision that was issued by FERC after this court's Exelon decision. And FERC talks about that at paragraph 121 of its rehearing decision. That's at the Joint Appendix, page 1294. And in that remand decision, what FERC recognizes is, although there's a complex procedure, but that capacity suppliers, they can essentially tag on to the ISO New England section 205 filing. But what's critical is FERC recognizes that if there's a capacity or a retirement deal listing in the ISO New England system, that is also an input into the auction. FERC recognizes that there are section 205 rights, and that the capacity suppliers retirement deal list will be accepted if the supplier demonstrates that it's just and reasonable. And now, FERC's response to that is ISO New England has a different tariff structure than PJM. And that's true. But the question is, what's the meaning of section 205 of the court term you're honor of rights demanded? And if they recognize that an input into the auction for purposes of ISO New England qualifies within the meaning of a right demanded, I don't think they can turn around here and say, the input, the capacity bid, the capacity offer into this auction is not a right demanded. It is actually in accord with what FERC has done in other cases. So on the section 205... Can a capacity offer be considered a right? Yes, your honor. I think it is a right demanded. Now, that doesn't mean... Some of those are deemed confidential, right? It is, your honor. And to be sure, there's a default under section 205 for rights to be made public, but that is not inherently the case. What both 205C and 205E have as a preface to those provisions providing public notice of race is, unless or to the extent that FERC regulations and orders direct the precise language, but it gives FERC some flexibility. And I presume in a circumstance where FERC thinks that offers should be kept confidential, they would exercise their statutory authority to have some narrow exemptions to the publicity or the publication requirements, which I think, understand, I think they are doing in ISO New England with respect to retirement fee list bids. Now, FERC did consider your alternatives, but then they ultimately decided that it would not have changed the conclusion about the offer cap. Oh, sorry. Yeah, back to the first... Yeah, but it's true that they don't... That they dislike the alternatives that we have given, but I'll say I think the more they try to suggest that the selection that they chose is permissible under the APA because they think our alternative option would have led to different policy outcomes they dislike. I'll say even if you grant all of that, that's not a basis to find that what they did do is compliant with the APA. And that's our fundamental point is that disallowing opportunity costs is not compliant with the APA because there's no reason to back away from that and it's just irrational. And let me just touch for a half moment on the second argument in our brief, which is there's this whole category of risks that capacity suppliers face getting into the market in addition to the opportunity costs that FERC has just fully disallowed. You didn't argue about opportunity costs in that portion of your brief, correct? No, this is... No, please. Sorry. I'm trying to make sure I have things in my head. So the costs you're talking about here are distinct from the opportunity costs. So what we're talking about, and this is under Roman 2 of our briefs, this is a distinct set of risks that capacity suppliers face. And these are things like risks of system-wide plant outage that would forbid a supplier or a generator from performing. And what FERC's key argument is to say is, well, you can't factor that into a capacity bid because they've basically hermetically sealed what they call on the one hand capacity risk and on the other hand energy market revenue risk. And they say you can only look at the risk for capacity, but it's capacity as capacity for this and we're going to disallow anything that goes into the energy markets. But that structure, that argument, I think falls apart. It's just arbitrary and capricious for a variety of reasons, but the most straightforward one is what is, in fact, the formula for the offer cap that's at issue here. So the market seller offer cap, this is in the tariff section 6.4A. It appears in the Joint Appendix page 620. The formula is avoidable cost rate minus projected PJM market revenue. What our argument is, is there are a series of risks that necessarily go into what the projected PJM market revenue is. FERC is only allowing consideration of the first half of that formula, the avoidable cost rate, but they're not recognizing that the very definition, the formula used for the market seller offer cap also requires a projection of market revenue. There is a risk that a plant may be out of service and not producing any PJM market revenue and that should be accounted for as a fundamental matter as to when you're calculating what the expected energy market revenue is. How does this argument differ from ones that were raised in the challenge to the 2015 order by, among others, Exelon? This is so importantly, Your Honor. And rejected by FERC then. Yeah, this argument wasn't, so it is true and this is one of FERC and especially the defendant market monitor's arguments saying this feature of the tariff design is consistent from the 2015-2016 order to today. But that part of the market design simply was not challenged. I mean, FERC tells us that at their brief at page 49, quote, no party challenged that holding on review. So when this court in advanced energy considered the earlier tariff, there wasn't a challenge to that. But the same argument could have been made back then, but it wasn't made. And there's a very practical reason, Your Honor, why it wasn't made. It's because of the fall offer cap as a practical matter. It wasn't putting... It could be a practical matter, but it seems like y'all had the opportunity to challenge it in 2015 and made a decision not to. This is something that has existed since the 2015 order and it wasn't challenged then and isn't it too late to challenge it now? We're not so happy with a different part of the program? So both the legal response and the practical response to that. As a legal matter, there's no sort of a stop hole or bar to that. This is a wholly new tariff and there's an aspect of it that we've shown under this argument to violate the APA for being arbitrary and capricious. It's not a defense to an argument that it's arbitrary and capricious, but the agency has been doing it for some time. I mean, if they had a statute of limitations argument or something like that or a collateral stop argument, those would be arguments, but they've not raised or lodged any arguments. So just an argument that they've previously been doing something that we think they've demonstrated is substantively arbitrary and capricious isn't a defense to it not being arbitrary and capricious. It just wasn't raised and litigated. And again, there's a good reason for that. It's because as FERC recognizes under the pre-existing system, most capacity suppliers use a default offer cap and there wasn't this push into unit-specific review. Now, FERC has made much of the fact that this new market design is designed to essentially push virtually every capacity supplier into the much more owner-specific unit-specific review where their offer has to go before the independent market monitor and all of these things then get factored into individualized basis. It's that market design change that has made this aspect of the tariff now really, really important. And so the fact that this aspect is really important, now why is there a spotlight on this and it being arbitrary and capricious is an argument that's being raised. But again... Well, but if I at least read Exelon's challenge as having raised this point before the commission with respect to the 2015 order and the commission addressing it and rejecting it, and don't you need to show some basis on which something more than what could have been argued then but it wasn't worth the time because you got what you liked on the default offer cap, FERC's going to be just flip-flopping from one order to the next and that's generally frowned upon. So you need to show some reason why they were wrong in their analysis in 2015, so wrong that they should change their position now. Well, two things about that, Your Honor. First, Exelon's not the only petitioner here and I don't think any Exelon-specific argument applies to the other six petitioners in the case. But second... Well, everyone else chose to let FERC know. They gave no signal they were unhappy and were living with it for quite some time. But Your Honor, I don't think the fact that an agency has previously rendered a decision back in 2016 that wasn't reviewed by this court or any other court, therefore blesses it in some way. Well, that order was definitely reviewed in a preliminary court and people were even serious enough about the argument to raise it on appeal. Yes, Your Honor. But the fact that that aspect wasn't challenged, FERC might be able to say that we've already decided this as a matter of FERC precedent. This is something that we've looked at and we can adopt the reasoning from 2016 here. Our principal argument, to be clear, as to this part, is not some failure of reasoning in FERC. Our principal argument is it's substantively arbitrary and capricious. But this is not a result that can be challenged because these are, in fact, real legitimate costs. FERC has never given an argument as to why they're not legitimate costs. They've just said they're not costs that belong in the capacity supplier ledger because they go to energy market revenues. And our point is that sealing off these two things doesn't work based on the formula. So our point is they just can't reach, as a substantive matter, this result. So, again, even if the court thinks that there's something procedurally appropriate about FERC adopting what it previously did, I don't think that answers the substantive challenge of being arbitrary and capricious. A FERC decision that isn't challenged doesn't, I think, become immune to later challenges when they readopt that same aspect of the tariff. And frankly, I think that sort of holding would be quite dangerous to say that the party, every time they think FERC has done anything in a tariff, has to bring to this court every conceivable challenge they have, or else 10 years, 20 years down the road, when that aspect of the tariff gets reincorporated, reenacted, and actually becomes important, unlike before, that it's going to be challenged. I don't think there's a legal basis for that. And I think the sort of framework that would set up- But we do an ordinary civil litigation all the time? Well, for issues that are, in fact, again, if FERC had a collateral estoppel style argument, they could suggest that. They have a res judicata. They could have been brought, but weren't. Right, but I don't think that res judicata or collateral estoppel type argument has been advanced or developed in the agency review proceedings. You sounded like it was the most incomprehensible thing ever, but we do it all the time. That's my only point. I take the point, Your Honor, but just given the complexity of FERC cases as they exist, I think if the court were to set a rule where the first time FERC does something, you must immediately challenge, even if it doesn't immediately affect your rights. Well, no, you did challenge, and you lost, and didn't seek further review. That's different than- One of the challenges is in seek review when it wasn't an issue that had immense practical importance. And again, I just don't think that the fact of a prior to be abolished, I just don't think less is just moving forward. I might finish on the Section 205 issues for a moment, or be happy to go anywhere else where I might have questions. Judge Heltz had drawn us to the Section 205. As I said, I think the two issues are, is it within the scope of the text? And for reasons we discussed, I think the answer is clearly yes. If it is, then I think the only second question is, has there been some action here that has removed the capacity suppliers Section 205 rights? And I think this court's decision in Atlantic City is really quite impactful on that, because what Atlantic City says is, first, Section 205 creates statutory rights. And second, that's any power to force a public utility to see those statutory rights. And I think the claim for seeking 205 rights in Atlantic City would be even stronger than that here, because there was the participate in PJM market. The precise tariff says that you'll have to give up your 205 rights. That's an express condition. And transmission operators voluntarily participated. And this court said, no, still, that's not the kind of voluntary waiver of these rights by contract in the Mobile Sierra Doctrine. It's the only circumstance that they've recognized where there could be accession of 205 rights. I think that what Atlantic City establishes quite squarely is that participation in the public utility is Section 205. And I think that is... I need to address Atlantic City if we accept Burke's sexual argument. If you accept Burke's sexual argument that we're just totally outside, then that's right, Your Honor. But I frankly don't think Burke's sexual argument has much weight to it. And I think that this is plainly a right commanded under just the plain text of that term. It's also, I think, consistent with what Burke has done in Exxon. But I think as a textual matter, this does qualify as a right demanded. But I agree, Your Honor, if you reject that at the outset, then the second issue would fall by itself. And your best authority that this constitutes a right under 205 is... You got the statutory argument. What's your best case? Your Honor, I'm not sure I have a particular case that has squarely addressed this. I think there's a lot of language in Exxon. Of course, it remanded without getting to a straight holding. But I think there's a lot of language in Exxon. It cuts both ways, actually. I'd like to think it cuts more towards us. But I'd start, though, with... I really think this is a matter of plain text of the statute. And nobody disagrees that the clearing price of capacity is the rate received. And so if that's the rate received, the rates that capacity sellers demand in the auction is the rate demanded. And so, again, it's not just the term rate, but it's also the disjunctive between received or demanded. And so I don't think a construction of Section 205 that limits it to the rate of the auction, which is the rate received, would do justice to the full statutory text, which also includes the rate demanded. And, again, I think the scenario where you mentioned the capacity seller who has a high rate and they don't clear, so they don't sell, that is a rate demanded. They didn't receive it because they didn't clear, but that still qualifies as a rate demanded within the meaning of the text. And the fact that the text has both rate received and rate demanded, I think inherently contemplates that there will be rates demanded that are not, in fact, paid or received. And that is squarely the context where you have a bid into an auction that doesn't clear. That is a rate demanded that you didn't receive. So I think actually we are squarely there and there hasn't been concession of these rights. And I think, again, the harm here to suppliers is significant. Otherwise, this affects a very substantial shift of authority from capacity suppliers to be able to select within the zone of unjust and reasonable rates where the price capacity offer to the independent market monitor and PJM in a way that is quite inconsistent with the Section 205 rate. And you'll see this in a whole host of, I think, day-to-day interactions because this will come up in each one of these offers that now go unit-specific review. So there are, you know, you can imagine a whole host. These are sort of mundane, everyday things, but now we're going to be transformed pretty profoundly. So a generator who has many units will have various system costs. You know, one near and dear to my heart, perhaps, avoidable expenses for legal services. And the question is, how do you allocate that among several different units that a generator might have? There can be different- Well, while you want to talk about a statutory only focusing on 205, there's a statutory scheme here. And you want us to ignore that aspect in interpreting Section 205. I mean, when you make an offer, I don't see where that establishes a rate. Rather, you're just asking for the market clearing rate. That's all FERC said in explaining why that argument didn't hold up. Your Honor, I don't think our argument on this score is a lack of explanation. It's that FERC's- I know that. I understand that clearly. But you're interpreting the statute, Section 205, in a way that FERC points out is basically inconsistent with other provisions of the Federal Power Act as to who's in charge of rates, et cetera, who reviews them, et cetera. And it's not the offeror. So that's all I was getting at. Well, with respect, Your Honor, I do think I disagree with that because Section 205- Well, we shouldn't look at the whole statute, much less defer to FERC's reasonable interpretation of it. Well, Your Honor, if there's a particular statutory provision that I could address, I'd be happy to. I don't think there is an inconsistency with other aspects of- No, I think some of the questions we've asked have already identified inconsistency. So no need to pursue it further. Judge, Your Honor, I think what the FERC's argument is that we're at odds with how they understand market mitigation principles. But we fundamentally disagree with that because ultimately the structure- And it's not their explanation. So that's what I'm getting at. There's a whole statutory scheme here about how rates are made, how they're reviewed, all those sorts of things. And I realize you want to, on behalf of your clients, want a different scheme. But that's a different issue as to whether or not what FERC has said here is inconsistent with the language of 205. With respect, Your Honor, I think the whole statutory scheme is a scenario where the public utility can select a rate and then it's FERC's determination to decide whether that public utility has met its burden to show that that rate is just and reasonable. And we completely agree with the whole notion that FERC has the obligation to determine whether that rate is just and reasonable. I think what the court may be suggesting is my sense that FERC suggests there's inconsistency with our position and what this court held in public citizen in the nature of using the RTO tariffs as part of that market mitigation. And let me answer that directly if I can because I think that might help. What the court in public citizen was addressing is how do we set up a structure where when FERC does not review individual rates, FERC can still make sure that it is adhering to its obligation to ensure that the rates in a market-based system are just and reasonable. And what the court's opinion in public citizen said, well, there's a structure for doing that, which includes complying with the tariff structure and also having ongoing monitoring by FERC of the market system. What that is addressing is that the problem of how do you set up rules ex ante that ensure, you know, with high confidence that you'll have just and reasonable rates without FERC reviewing those rates. And when there is a capacity bid that is done pursuant to that, then public citizens, this court's decision in public citizen say FERC has generally satisfied obligations to ensure just and reasonable rates. What we're proposing, though, is when there's a disagreement between the PJM and the public utility, then that specific rate goes directly to FERC. FERC is ultimately in the role of decision-maker to determine whether or not that rate is a just and reasonable rate. You don't have that situation, then, of trying to set up a system ex ante for how you ensure just and reasonable rates that FERC isn't looking at. FERC would, in fact, be looking at that specific rate proposed by the utility with any views from PJM or the independent market monitor. It would make that determination. It makes a determination whether that price is consistent with the tariff. But as Judge Rogers was explaining, the rate under our current system is this sort of open market tariff. It is a process rather than a number. And so when FERC reviews those types of claims that you're talking about, they say we're looking for compliance with the tariff. But here's, I think, the critical question is the tariff is not just one big mathematical formula. There is numerous kinds of discretionary decisions that get made into the input for that. So the one example that my clients have supplied is when they have to do certain maintenance, a state of rewind, whether or not they're going to use new copper or used copper is determinations they might have to make. And they might want to use new copper. But the independent market monitor might say your bid should be priced on the basis of new copper. Tariff doesn't control this. It's not, you know, a yes or a no. It's a question, it's a judgment question. It's a question, what's the range of reasonable? Where does this fall within reasonable? The core part of the Section 205 right is if the supplier has a 205 right, if its judgment is reasonable, is within just and reasonableness, it can select that for deciding the inputs into the tariff. If, though, FERC is correct, then the independent market monitor can change that and if PJM agrees, then the independent market monitor's views override the supplier's, even if the supplier's view was just and reasonable. The independent market monitor doesn't have to find that it was unjust and unreasonable, nor would the independent market monitor have a statutory authority to find unjust and unreasonable. That's the point of taking away that clear discretion from the inputs that go into the tariff. The structure that FERC has established under this petition for review of staying compliant with the tariff, what that tariff sets up is when you have these discretionary determinations, is it new copper, is it used copper, that selection is made by PJM or the independent market monitor, not by the public utility. And so that's, I think, where the rubber really meets the road and why the key flexibility for the generators is important. It just isn't some abstract concern. But it's completely consistent with ensuring that there's market mitigation and FERC review of just and reasonableness because to the extent that the tariff-based approach where PJM disagrees, then it goes directly to FERC. And FERC is not using ex ante rules where it's guessing why, whether or not that rate is going to be just and reasonable. It's looking at the specific proposal and it can make an up or down decision. And comparing it to the tariff. The tariff is going to be very important, yes, Your Honor. I mean, if the argument is that we're going to do something that's completely inconsistent with the tariff, I don't think FERC's going to take terribly long in saying that's unjust and unreasonable. But what we're focused on is not, you know, is this outside the tariff or inside the tariff? This is, you know, how have you allocated these cost factors? I think we understand. Unless my colleagues have more questions because we've kept you up for an awfully long time. You have more questions? No. Okay, thank you. Thank you. Mr. Flynn for PJM? Please record Paul Flynn for PJM Interconnection. So PJM's concern about FERC SOAR is that what do we care about? We want to make sure that there is no exercise in market power. But where there is a real legitimate cost, the supplier has. We want to make sure they have a reasonable opportunity to include that in their capacity so that we are not deterring folks who would be submitting offers the same way they would submit them if there was a competitive market and they had no market power. Say, no, you can't do that. And we think that that's what happened below. FERC overshot. It went dramatically away from the capacity performance contract. It has practical effects in a way that overshoots. And what we're hoping is that you will send it back to them and say, FERC, you overshot in a way that you didn't adequately explain. Go take another look at this. Some of this stuff needs to be recovered, whether it's in the default or the unit specific. Because the end result of what FERC did was such a good outcome. That's where we're at right now. So, specifically, how did FERC get it wrong on this issue of opportunity costs? Opportunity costs and the default offer cap issue. I'm sorry. I didn't hear what your other one was. In my mind, I'm calling this the energy market costs. The opportunity costs. I'm sorry. Were you finished? No, I'm just trying to make sure. The opportunity costs and the other rates. On the opportunity costs, the fundamental problem is they sort of threw the baby out with the bathwater because the real problem was the difficulty, the fact that we haven't had the number of performance assessment hours or intervals that were expected. And so, based on that, FERC found that the existing rule was not just unreasonable. But FERC went well beyond. There's a problem with the performance assessment to say, you know, we're throwing out the entire approach of having any possibility of including the opportunity cost of avoiding these, of not getting these bonus payments that performance still provides. But you can't include those in the offering under no circumstances. So, they just went too far and they never really came to grips with the fact that they went too far. They came up with this idea. Well, that's energy. I mean, excuse me. It took me years. But they never really explained why you have to go so far to throw out the entire allowance opportunity cost as opposed to something. I thought that they said that the producers here so grossly overshot that they were exercising market power. And that seems, no one seems to challenge that. And that, I'm just talking about the bonus, that cost right here. The reason they grossly overshot was because we were assuming three hours a year. And there were almost none. Well, exactly. And so, if it's an almost no, almost zero number, and the other proposal was simply to increase penalties but still not address the problems with a reliable computation of what this opportunity cost is, especially given that over time it was looking like it was approaching zero. And no one was giving a more reliable method for computing that, then why is it within FERC's discretion to say you gave us something that was completely broken? Your backup, your plan B here is no better. It leaves the same problem in place that we still can't measure with any reliability opportunity cost in a way that will ensure no one's exercising market power. And so, instead, we're going to shift to this unit-specific approach. Why is that not within FERC's discretion? Well, I'm sure they'll explain it better than I am, but that's my short hand at this. For one thing, you could still have performances that still exist in the tariff and they still may occur. And when they do, then some people will pay penalties and some people will get bonuses. And so, that is a real thing that still exists in the tariff. It isn't like the last time bonuses were paid, according to this record. I'm not sure if these are words. That's right. Right. That seems part of the problem, because, you know, it seems like they haven't been charging a lot of penalties either. So, that seems to confirm their point. There's really no way to measure this. So, we're going to go, and we had such a problem of market power exercise with this approach that we're switching to unit-specific, at which point, then, you have, I know, a separate argument about the problem with, do you perceive it with what they did on the unit-specific cost analysis? Right. And on that point, on the issue of resulting risk, their answers were, oh, that's energy. You resolved it in capacity performance or risk, and see. I'm sorry. I didn't hear the rest. I apologize. I didn't hear the rest of your sentence. So, that's energy market. Their first rationale for not allowing the additional risk was, number one, oh, that's an energy risk. Number two, we already resolved that in the capacity performance order. And number three, you're asking for the sun, the moon, and the stars to put in anything you want. And so, what I would say is, on the energy risk, from PGEM's perspective, what's going on here is that when you submit, and this is our concern, when you commit capacity to our region to help us out to keep the lights on the worst day of the year, we want to be sure that if you have additional costs that you're going to incur from taking on that capacity commitment, then you should be allowed to include those in your offer. And that would be a cost-based offer. And so, where you take on a capacity commitment and you now have an obligation to enter into the energy market every day, which you do not have otherwise, that is an additional cost related to taking on a capacity commitment. When the price you're permitted for capacity is determined as the difference between all your costs and an estimate of what you'll get in the energy market, then at that point, what you will get in the energy market is directly pertaining to whether what you got in the capacity market is reasonable, and can you include, can you reflect some level of uncertainty in that when you are submitting your offer into the capacity market. So, from our perspective, these do relate to capacity. They do affect whether, let's suppose a competitive seller doesn't have market power. That's the type of thing they would think about in deciding whether or not to submit an offer into the capacity market, and whether they can submit an offer to the firm. I thought, as I read Sperk's order, they said it is, we'll let you include opportunity costs as long as they are, again, I don't have their exact words, it took my time, but sort of verifiable and objectively, you show that they're sort of computable in a rigorous way or a verifiable way, again, to avoid market power concerns. And the problem is that a lot of these other costs haven't been shown by the suppliers to be computable in any concrete way, at which point then, and we're only talking about risks, anyhow, we're not talking about certainties, but risks that are sort of aesthetic, and I know aesthetics are too amorphous to actually compute in a concrete, verifiable way, both creates, again, the same kind of market power concerns we had with the offer cap, and it risks shifting 100% of this risk to consumers. So it's sort of two things as I read it. Well, from B-Chunk's perspective, we would only support it if it is something that can be documented and quantified. And it is currently the case that under the tariff which results from these orders, you don't get these types of opportunity costs at all. The only thing that the tariff allows as a quote-unquote opportunity cost is if you have the opportunity to make a sale in New York, for example, you can include what you could have got if you had made a sale in New York as part of the price that you can submit into our capacity market. That's the only opportunity cost. So it isn't a – it's not permissible to include any other opportunity costs in the tariff. So to the extent FERC suggested that in order. That would have been correct. Probably my formulation, to be clear, is how I read it. Well, and there are a little unclear on exactly what you can recover in the component of the unit-specific, because the unit-specific says here are all these categories. We'll lay them out in the tariff. These are the different categories. And one of them is capacity performance quantifiable risk. And what it says in the tariff is it's the risk that you will not perform under capacity performance. And FERC in its characterization of that, particularly in the unit order, actually suggests more than that, which is a little bit concerning because that's not what the tariff says. And we'd hate to say, oh, but you said over here that you could include a little more than that. And they would say, well, no, I'm sorry. The tariff just says you've got to tie it down to not perform. So we see that as a problem as well, where clearly you could do that because the – I mean, the opportunity cost that was permitted in the prior default rate, which included the opportunity cost of, oh, if I'm not in the capacity market, I can get bonus payments. So if I am in the capacity market, I'm getting bonus payments. It's closer to this idea of penalties as well. And so there are multiple considerations that go into the capacity performance construct, not limited to the specific issue of whether your research will perform. And right now, at least the way the tariff is looking, that's all you can get as a result of these orders. And our concern is that's not enough. And that's what we're trying to do. Okay. Do our colleagues have any questions? No. Okay. Thank you very much. Afternoon, everyone. Good afternoon. I'm Matt Estes here on behalf of the Federal Energy Regulatory Commission. I want to start with the Section 205 filing rights issue. I was a little confused about Mr. Hughes' argument. It sounded at first like he was claiming that offer cap provisions and tariffs, which substitute the offer cap and the tariff for an offer, violate Section 205 rights. I don't think that could be the case. It can't possibly violate your Section 205 rights to have to comply with the tariff, pursuant to which you're making your sale. He then backed away from that by saying, no, it didn't really apply to that. It only applied here because somehow the commission has given the market monitor the ability to set the offer cap. That's not correct. The tariff gives the suppliers the ability in the first place to propose an offer cap based on the formula. The market monitor simply reviews that offer to see if it complies with the tariff. Ultimately, if the supplier disagrees with what the market monitor determines, it can go to the commission and ask the commission to decide what cap complies with the tariff. It doesn't have to prove that the market monitor is wrong. The commission specifically said that was not correct. To the extent that Mr. Hughes is complaining that the tariff is not specific enough, that has nothing to do with their filing rights. They may or may not have some claim that the tariff should be made more specific. But that's a different issue. They've not raised that on appeal. They didn't raise that below. Can I ask a fact question? If the market monitor looks at a proposal and rejects it, does the market monitor do any kind of written decision or explanation, and the same for if it's reviewed by PJM? And then do either of those get looked at by the commission if they take it to the commission? I believe they do, Mike.  Well, you might want to confirm that. But it's also, I just want to push back a little bit. The market monitor can't reject a supplier's proposal. It just says it disagrees. The parties are supposed to try to reach an agreement. If they don't, then the supplier goes to PJM and asks it to make its own independent determination. And if it disagrees with that, then it comes to the commission to ask it. And the just and reasonable standard doesn't fit in there at all, you correctly pointed out. The question is whether the offer complies with the tariff. The arguments on the commission's finding that it offers not a rate, that was an alternate grounds provided by the commission for its decision. There are no precedents one way or the other in that issue. I thought public citizens were supposed to. Well, it didn't say that an offer was or was not a Section 205 rate. Can you address the exclusion of risks, energy market risks under the specific cost rate? Yes. Well, the first thing to point out is the commission did not issue a new tariff with that respect. Those risks have never been included in the formula since 2006. And the type of risks they're talking about, the risks that you will underperform your estimated revenues have always been there. All the commission did in this case was say, we're going to use the existing tariff. So I think there is a collateral estoppel argument. The commission did not say that in its orders. What it did say is we've already rejected that argument. And it also pointed out that the suppliers never provided any other reason that things have changed now that would lead to a different result. So and I also think that it's incorrect to say that the way the formula works precludes them from recovering their costs. It's important to remember that suppliers in a competitive market are not entitled to guarantee the recovery of their costs. The petitioners acknowledge that principle at age 40 years their brief. They're only entitled to the opportunity to recover their costs. And the formula specifically gives them that opportunity. The capacity calculation is intended to allow them to recover all of their costs that they would incur, be expected to incur in the capacity market. And then you subtract out the projected energy revenues. That means on its terms, if the supplier needs its projections, it's recovering all its costs. Yes, there's a risk that it might not meet those projections. There's also an opportunity to over-recover its costs if it meets its projections. The important point is it is given the opportunity to meet its costs. That's what everybody agrees they're entitled to. So and that's the way this tariff has worked since 2006. I do want to briefly mention, going back to the Section 205 issue, Mr. Hughes' intention that an offer clearly is a rate demanded. What the offer says is I will charge X, which is the offer, anything more than that that comes out of the capacity market. So it's really I will charge, let's say, $10 or more. Under the standards for rates that have been established by this court, in order for a rate to satisfy the requirements of Section 205, it has to do one of two things. It either has to specify in the rate the specific price, or it has to set forth a formula for which you can look at the formula and determine what the rate's going to be. An offer doesn't satisfy either of those requirements. So I don't think it's clear that an offer constitutes a rate demanded. Moving to the opportunity costs issue, I was quite surprised to hear Mr. Hughes refer to Paragraph 71 of the unit-specific order as representing a holding that the Commission agreed that it was possible to come up with an appropriate estimate of what the emergency hours would be. That's because, in fact, the Commission said the exact opposite. It said it is difficult to come up with an estimate that is appropriate for general use. So, as you correctly pointed out, Your Honor, that was an important part of the Commission's decision that it didn't think the formula could be used because it didn't think it was possible to come up with the inputs to go into the formula. And that's especially important because the experience showed that there had been no penalties paid, which meant that there's no bonuses paid, which meant that, in fact, there were no opportunity costs incurred by any supplier. Didn't the book say that suppliers can consider, that can include in their calculation, the risk of noncompliance and facing penalties? Yes, absolutely. Well, and the bonuses are just paid out of the penalties, so I don't understand how you can compute one without necessarily being able to compute the penalty. Well, you can compute the penalty. That's not the problem. The question is… No, but the risk of the penalty. I mean, they're not including the amount of the penalty. They're including the risk of incurring a penalty and what that cost might be. The book doesn't always charge penalties, and that is allowed to be in there, and it seems to me that that really is just the other side of the coin from the bonuses because the bonuses come from the penalties. I don't know how one can be calculable and the other can't. Well, what the commission said in that same paragraph 71, if it's in a specific order, is that it's too difficult to calculate a generally applicable risk that, for purposes of calculating the risk that goes in the formula, that an individual supplier can have its own supportable evaluation of the risk. The problem is determining what should apply generally. Do you have any other questions? No. Do you want to wrap up? Thank you. Mr. Mays from the market monitor, would you be able to explain to me a little bit about how this process works when someone submits a proposal to the market monitor and the market monitor thinks it's inconsistent with the care of what kind of explanation happens and if you know what kind of explanation happens? Sure. I'll be happy to talk about the process. We have staff that talk to the various participants about their offer. They provide us information about their costs, very confidential information that we review. We look at the rules for how you calculate an offer cap and we also provide the piece of the equation, the net revenues. We come up with a level of an offer that we show them what we think the level is that would be a competitive offer. They come up with their offer. We go back and forth discussing it. Usually, almost always, we come to an agreement. Sometimes we don't. Sometimes the participant wants to offer at a level higher than what we think is competitive and appropriate. One thing that the process requires is for them to provide that level and they're committed to their level even though it's higher than what we think is a competitive offer. They tell us what that does is it allows us to evaluate the impact if they could afford that offer to the market. We can look and see what the likelihood is that it would raise market power and consider whether we would need to go to FERC about that. The other piece of the process is then, if there remains a dispute, that we go to PJM. PJM's role is to review compliance. They're really looking just at the tariff and whether or not the proposed offer complies with the tariff. They may decide that it does comply with the tariff even though we disagree with it. If that happens, the participant is committed to offer at the level that they're committed to. It's responsible to offer, including whether that offer constitutes an attempt to exercise market power. We would evaluate the likely harm from allowing it off the market. If we determined that it was necessary, we would take the matter to the commission in a complaint or other action. Typically, it would be a complaint. We would bear the burden of proof to show that the offer was unjust and unreasonable, that it was not competitive, and that it constituted an attempt to exercise market power. We would have to litigate any issue we had with compliance. Do you issue a written decision explaining your rationale? We explain our rationale in conversation. I don't know if there's a formal process where we issue a letter detailing every dispute. But it certainly comes up, and we would provide that information if a participant asks. If they take it to PJM, how does PJM know the basis for your decision? We communicate as part of that process. We're required to notify PJM of the level that we come up with and the level that the participant comes up with, and we have robust discussions with PJM about that. Are you aware whether PJM issues any kind of written decision? I think I'm not aware of what the content would be, but they tell the participant whether they find the offer compliant or not, so the participant knows whether they can go forward with that offer in the auction. This all occurs in the days, you know, maybe the 190, about 100 days before the auction, with the idea that we will ex ante give information about the nature of the offer before the auction. So it's to provide more certainty and confidence in the individual auction results. Are there any questions? Okay, you can wrap up if you like. Can I proceed with my statement? I'll give you about 30 seconds. Okay. Wrap up. So, you know, the purpose of the market model that we've talked about is to protect competition in PJM markets. We bring issues to the attention of those who are going to have to address them. We don't make those decisions. To get to some of the issues that we're confronting in this case, one is the nature of the net ACR offer, and we've discussed that that offer has been in place since the beginning of the PJM market in 2006. That market, it has always accounted for some risk. For one thing, there's a 10% adder on top of all the costs that go into ACR. There's room to account for risk in that. And then there are the cost components. The purpose of the market is to provide capacity when needed. That's what the capacity product is. And the cost that we're looking at are the costs to provide capacity when needed. And when the participants determine whether to spend money, part of that money is spent to address the risk that it will not be able to provide the capacity when needed. For example, there's an important provision called project investment. And so if a unit were concerned that it would not be able to deliver capacity when needed, it would spend more money to try to make its unit better and more capable. And so that cost of investment would factor into the offer. So the risks were accounted for in costs. Risks were also accounted in the provision that we talked about specifically, the capacity performance quantifiable risk provision. And that provision is very reasonably limited to costs that are quantifiable and reasonably supportive. So we don't think much of the arguments about risk and the awarded cost offer. Okay, great. Thank you very much. So here's one of your three minutes. Thank you, Your Honor. I'd just like to start briefly with the Section 205 issue. And the argument that we have to comply with the tariff we submit is just too simplistic. I don't think there's a disagreement about complying with the tariff. The issue is these are far more complex calculations that require judgment. I gave the example earlier of new copper, used copper. Let me offer a different example that comes from FERC's hearing order, paragraph 57, Independence page 1259, where FERC says, quote, there may be more than one just and reasonable expected PAI value. That's the expected emergency hours. FERC recognizes that inputs into the tariff, there can be more than one just and reasonable value. That's the whole point of rate making. There just isn't one value. The question here comes down to not complying with the tariff, but when there are multiple reasonable options, how is that selected? And the way that this structure is set up is the supplier makes a proposal. The IMM disagrees. It makes an alternative proposal.  PJM rejects the supplier's proposal. Then the independent proposal becomes the rate. Now, you can petition, as the court's mentioned, to FERC to have FERC see if there's compliance with the tariff. But I think it would be very difficult for a supplier to show there's not been compliance with the tariff if the rate that's selected is somehow within the tariff. But the problem is you've shifted who gets to select the just and reasonable rate from the supplier, who if we're right about section 205 should have that right, to the independent market monitor at PJM, we don't think should have that. That's the core issue. The other practical problem is on a petition, they don't know what the petition for FERC is. If it's a Rule 207 petition, this may be something that is completely discretionary at FERC and may not even be something that FERC has to respond to. Briefly, on rates, I think the court appreciates the argument there about separating energy and capacity. It just doesn't hold up. We think on opportunity costs, FERC has identified in paragraph 71 that it can calculate. It's the same should be true. Okay. Colleagues, do you have any further questions? No. Okay. Thank you very much. The case is submitted.
judges: Millett, Childs, Rogers